**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

BRENT CULLISON, Derivatively on Behalf of
QUANTUM CORPORATION,

     Plaintiff,

v.

JAMES L. LERNER, KENNETH P. GIANELLA,
LAURA NASH, DON JAWORSKI, JOHN FICHTHORN, H
UGUES MEYRATH, JOHN R. TRACY, EMILY WHITE,
JAMES C. CLANCY, and TONY J. BLEVINS,

     Defendants,

-and-

QUANTUM CORPORATION,
a Delaware Corporation,

     Nominal Defendant.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

---

     Plaintiff Brent Cullison ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Quantum Corporation ("Quantum" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits and matters of public record.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the Individual Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

5.      In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6.      Plaintiff is, and was at relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.   Plaintiff is a citizen of the state of Texas.

### Nominal Defendant

7.      ***Nominal Defendant Quantum*** is incorporated in Delaware and its principal executive offices are located at 10770 E. Briarwood Avenue, Centennial, CO 80112. The Company's common stock trades on the NASDAQ exchange under the ticker symbol "QMCO." Nominal Defendant Quantum is a citizen of the states of Colorado and Delaware.

### Director Defendants

8.      ***Defendant James J. Lerner*** ("Lerner") served as the Company's Chief Executive Officer ("CEO"), Chairman of the Board of Directors ("Board"), and President until June 2, 2025. Upon information and belief, Defendant Lerner is a citizen of the state of California.

9.      ***Defendant Hugues Meyrath*** ("Meyrath") has served as the Company's CEO and director from June 2025 to the present. Upon information and belief, Defendant Meyrath is a citizen of the state of Florida.

10.      ***Defendant Don Jaworski*** ("Jaworski") has served as a director of the Company at all relevant times. He also serves as Chairman of the Board, Chair of the Leadership and

Compensation Committee, and a member of the Audit Committee and Special Committee. Upon information and belief, Defendant Jaworski is a citizen of the state of California.

11.    **Defendant John Fichthorn** ("Fichthorn") has served as a director of the Company at all relevant times. He also serves as Chair of the Corporate Governance and Nominating Committee. Upon information and belief, Defendant Fichthorn is a citizen of the state of Connecticut.

12.    **Defendant John R. Tracy** ("Tracy") has served as a director of the Company at all relevant times.  He also serves as the Chair of the Audit Committee and the Special Committee and as a member of the Leadership and Compensation Committee and Corporate Governance and Nominating Committee. Upon information and belief, Defendant Tracy is a citizen of the state of New Jersey.

13.    **Defendant Emily White** ("White") has served as a director of the Company at all relevant times. She also serves as a member of the Audit Committee, Leadership and Compensation Committee, Corporate Governance and Nominating Committee, and Special Committee. Upon information and belief, Defendant White is a citizen of the state of California.

14.    **Defendant James C. Clancy** ("Clancy") has served as a director of the Company at all relevant times. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Upon information and belief, Defendant Clancy is a citizen of the state of Massachusetts.

15.    **Defendant Tony J. Blevins** ("Blevins") has served as a director of the Company at all relevant times. Upon information and belief, Defendant Blevins is a citizen of the state of California.

16.    The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

17.    *Defendant Kenneth P. Gianella* ("Gianella") served as the Company's Chief Financial Officer ("CFO") from January 2023 until April 3, 2025. Upon information and belief, Defendant Gianella is a citizen of the state of California.

18.    *Defendant Laura K. Nash* ("Nash") has served as the Company's Principal Financial Officer since August 18, 2025.  She has also served as the Company's Chief Accounting Officer since June 2023. Upon information and belief, Defendant Nash is a citizen of the state of Washington.

19.    Defendants Gianella and Nash, along with Defendants Lerner and Meyrath are collectively referred to herein as the "Officer Defendants."

20.    The Officer Defendants and Director Defendants are collectively referred to herein as the "Individual Defendants."

## BACKGROUND

21.    Quantum is a data storage, management, and protection company that provides technology to store, manage, archive, and protect video and unstructured data throughout the data life cycle.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

22.    On November 14, 2024, Quantum filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2024 (the "2Q24 Report").  Attached to the 2Q24 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants

Lerner and Gianella attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

23.     The 2Q24 Report stated the following regarding the accuracy of the Company's financial statements:

> Notwithstanding the identified material weaknesses, management, including our chief executive officer and chief financial officer have determined, that the condensed consolidated financial statements included in this Form 10-Q fairly represent in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, for the periods presented in accordance with U.S. generally accepted accounting principles.

24.     The above-referenced statement was materially false and misleading at the time it was made because, due to the Company's improper revenue recognition practices, the condensed consolidated financial statements included in the 2Q24 Report did not fairly represent in all material respects the financial condition, results of operations, and cash flows of the Company.

25.     On February 12, 2025, Quantum filed with the SEC its Quarterly Report on Form 10-Q for the period ended December 31, 2024 (the "3Q24 Report").  Attached to the 3Q24 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Lerner and Gianella attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

26.     The 3Q24 Report stated the following regarding the accuracy of the Company's financial statements:

> Notwithstanding the identified material weaknesses, management, including our chief executive officer and chief financial officer have determined, that the condensed consolidated financial statements included in this Form 10-Q fairly represent in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, for the periods presented in accordance with U.S. generally accepted accounting principles.

27.     The above-referenced statement was materially false and misleading at the time it was made because due to the Company's improper revenue recognition practices, the condensed consolidated financial statements included in the 3Q24 Report did not fairly represent in all material respects the financial condition, results of operations, and cash flows of the Company.

28.     The 3Q24 Report provided the following, in pertinent part, regarding the financial statements included within the 3Q24 Report:

> The accompanying unaudited condensed consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information. All intercompany balances and transactions have been eliminated. Certain information and footnote disclosures normally included in annual financial statements have been condensed or omitted.  The Company believes the disclosures made are adequate to prevent the information presented from being misleading.

29.     The above-referenced statements were materially false and misleading because the Company had improperly recognized revenue in the third quarter of fiscal 2024, in violation of generally accepted accounting principles.

30.     The above-referenced statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) Quantum improperly recognized revenue during the fiscal year ended March 31, 2025; (ii) as a result, Quantum would need to restate its previously filed financial statements for the fiscal third quarter ended December 31, 2024; and (iii) as a result, the statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times.

## **THE TRUTH EMERGES**

7

31.     On June 30, 2025, after the market closed, Quantum filed with the SEC a Notification of Late Filing on Form 12b-25, announcing that it would be postponing the filing of its Annual Report because it was in the process of reviewing its revenue recognition accounting practices (the "Late Filing Notice").  The Late Filing Notice stated the following:

> Quantum Corporation (the "Company") has determined that it is unable to file its Annual Report on Form 10-K (the "Form 10-K") for the fiscal year ended March 31, 2025 ("Fiscal 2025") by June 30, 2025, the original due date for such filing, without unreasonable effort or expense due to the circumstances described below.
>
> The Company is reviewing its accounting related to certain revenue contracts as well as the application of standalone selling price under applicable accounting standards. The results of the review will need to be reflected in the Company's financial statements for Fiscal 2025 in the Form 10-K. The Company does not expect the current review will affect the Company's financial statements for any fiscal periods prior to Fiscal 2025.

32.     On this news, the price of Quantum stock fell $1.00 per share to close at $8.97 on July 1, 2025.

33.     Then, on August 8, 2025, after the market closed, the Company filed with the SEC a current report on Form 8-K (the "August 8 8-K") which announced, among other things, that the Company's 3Q24 financials could not be relied upon and would be restated to show a new decrease of approximately $3.9 million in revenue, and that there were deficiencies in the Company's internal control over financial reporting and the Company's disclosure controls and procedures that constituted material weaknesses as of December 31, 2024 and March 31, 2025.  The August 8 8-K stated, in part, the following:

> On August 8, 2025, the Board of Directors (the "Board") of Quantum Corporation (the "Company") concluded that the Company's previously-issued unaudited interim condensed consolidated financial statements for the fiscal third quarter ended December 31, 2024 contained in its Quarterly Report on Form 10-Q (the "Non-Reliance Period"), as well as its disclosures related to such financial statements, including any reports, earnings releases, and investor presentations, and related communications issued by or on behalf of the Company with respect to the Non-Reliance Period, including management's assessment of internal control over

8

financial reporting and disclosure controls and procedures, should no longer be relied upon. The determination by the Board was made upon the recommendation of the Audit Committee (the "Audit Committee") of the Board and after consultation with the Company's management team.

In June 2025, the Company identified certain service and subscription revenue inconsistencies during the Non-Reliance Period, which is deferred under Accounting Standards Codification Topic 606 ("Topic 606") and recognized ratably over the term of the contract. The Company's management reviewed and updated the periods over which revenue was being recognized to ensure consistent application for all service contracts invoiced in the fiscal year ended March 31, 2025 and the results have been applied to revenue. The Company's management determined that no contracts entered into prior to fiscal year ended March 31, 2025 were impacted. The Company also determined that the standalone selling price that is used to allocate revenue under Topic 606 needed to be updated for the fiscal year ended March 31, 2025 resulting in an adjustment to revenue. As a result of these errors, the Company will restate the financial statements for the Non- Reliance Period (the "Restatement"). Subject to completion of its financial close procedures, the Company currently expects the Restatement will result in a decrease of approximately $3.9 million in revenue and a similar decrease in net loss from operations in the Non-Reliance Period.

In connection with the Restatement, the Audit Committee concluded, with concurrence of management, that there were deficiencies in the Company's internal control over financial reporting and the Company's disclosure controls and procedures that constituted material weaknesses as of December 31, 2024 and March 31, 2025. The Company expects to report material weaknesses related to the Company's revenue recognition. As a result of these expected material weaknesses, the Company believes that it did not maintain effective entity-level controls within the control environment to prevent or detect material misstatements. Additional deficiencies or material weaknesses in the Company's internal controls may be identified during its review. The Company's full assessment of the effectiveness of its internal control over financial reporting will be described in more detail in the Annual Report on Form 10-K for the year ended March 31, 2025 (the "2025 10-K").

34.    On this news, the price of Quantum stock fell by $0.14 per share to close at $7.43 on August 11, 2025.

35.    Finally, on August 18, 2025, after the market closed, the Company filed with the SEC a current report on Form 8-K (the "August 18 8-K").

36.     Amidst the fallout from the Company's financial restatement, the August 18 8-K disclosed, among other things, that the Company's CFO, Lewis W. Moorehead, would be resigning from his role – after holding it for less than five months.

37.     On this news, the price of Quantum stock fell by $0.61 per share to close at $6.83 on August 19, 2025.

38.     As a result of the Individual Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, the Company has suffered significant losses and damages.

## DAMAGE TO THE COMPANY

**Securities Class Action**

39.     On September 4, 2025, a securities class action complaint was filed in the United States District Court for the District of Colorado against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 in the case captioned: *Lee v. Quantum Corporation, et al.*, Case No. 1:25-cv-02770 (D. Colo.) ("Securities Class Action").

40.     As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Unjust Compensation**

41.     At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

42.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated for.

43.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

44.     As a direct and proximate result of the Individual Defendants' conduct, the Company will lose and expend many millions of dollars. Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein.

45.     In addition, these losses include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

46.     As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## CORPORATE GOVERNANCE

47.     Board members are held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

48.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Quantum, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

49.     At all relevant times, the Company had in effect its Code of Conduct, which it refers to as "OnTraQ." The Code of Conduct applies to "all employees, officers, directors, contractors, consultants, and agents (the Quantum Team)."

50.     In a section entitled "We generate revenue responsibly," the Code of Conduct states:

> Business arrangements that significantly differ from our standard terms can create revenue recognition, cash collection, and recordkeeping challenges. The following practices are strictly prohibited, and anyone aware of or involved with them may be subject to disciplinary action, up to and including termination:
>
> []     Channel stuffing, or leveraging distribution partners to stock more inventory than they actually want or need;
>
> []     Entering into deal-specific sales to distribution partners before the expected end user purchase order is created;
>
> []     Offering purchase price discounts, payment term extensions, or inventory stocking arrangements or returns that have not been approved by the accounting team in advance; or
>
> []     Engaging in a side deal, which involves accepting terms and conditions that have not been approved by the legal and accounting departments.

51.     In a section entitled "We follow internal controls," the Code of Conduct states:

We adhere to Quantum's finance and internal control structure, including SOX controls and our revenue recognition policy. If you are asked to represent that we are in compliance with those requirements, do so honestly and with full disclosure of any situations that might conflict with internal control procedures.

Use the OnTraQ Helpline, Quantum's confidential and anonymous reporting service powered by Convercent, to promptly report any of the following situations as soon as you become aware of them:

[]     The Company's failure to comply with accounting procedures mandated by applicable securities laws, the SEC, or other applicable rules, regulations, or official guidance;

[]     Requests made to you, or anyone else you are aware of, to discharge assigned duties in a manner that fails to comply with any such rules, regulations, or guidance;

[]     Requests to improperly report revenue or falsify any other records related to compliance with the SEC's rules, regulations or guidance; or

[]     Anyone falsifying records at the Company.

52.     In a section entitled "We represent Quantum well," the Code of Conduct states:

We obtain approval from the marketing and legal teams before speaking publicly on behalf of Quantum. When not speaking on behalf of Quantum, we are clear that the views expressed are our own and don't represent Quantum's corporate opinion.

Quantum's public communication processes and securities filings promote full, fair, accurate, timely, and understandable disclosure. Special rules govern communications between Quantum, investment analysts and advisers, and shareholders. Only Quantum-authorized spokespeople should conduct official communications.

53.     In a section entitled "We trade stock responsibly," the Code of Conduct states:

Our ability to trade Quantum stock is limited when we have material nonpublic information, including unannounced information about financial results and strategic business plans. That trading limitation extends to others with whom we have close relationships, as well as the securities of our business partners if we have access to important information they have not yet made public.

54.     In a section entitled "We maintain accurate records," the Code of Conduct states:

The emails and documents we create form a record of Quantum's business interests and transactions, so it's important we maintain them in accordance with the Company's Records Retention Program. In addition, full compliance with applicable litigation hold requirements is expected from all members of the Quantum Team.

55.    The Code of Conduct closes by encourage "responsible reporting," and noting the Company's "policy prohibiting retaliatory actions against anyone who raises an ethics or compliance concern in good faith."

**Audit Committee Charter**

56.    At all relevant times, the Company had in place its Audit Committee Charter which set forth the duties and responsibilities of the Audit Committee members. To begin, the Audit Committee Charter states that the Committee's purpose is to:

[]    Assist the Board in its oversight of:

  []    the Company's financial statement integrity;

  []    the Company's internal accounting and financial reporting processes and controls adequacy;

  []    the Company's compliance with legal and regulatory requirements;

  []    the Company's policies and processes for risk assessment and management;

  []    the qualification, independence, and performance of the Company's independent auditors; and f. the Company's internal audit function performance; and

[]    Prepare the Audit Committee report required by Securities and Exchange Commission (SEC) rules.

57.    The Audit Committee Charter then sets out the following duties and responsibilities, in relevant part:

*Oversight of Company Financial Statements and Internal Controls*

14

[]     Review and discuss the Company's annual audited financial statements and quarterly financial statements with management, the internal auditor, and the independent auditors, including the Company's disclosures under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Company's reports filed with the SEC.

[]     As appropriate, the Committee shall review with management and the independent auditors, in separate meetings if the Committee deems it necessary: (i) any analysis or other written communications prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effect of alternative GAAP methods on the financial statements; (ii) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and (iii) the effect of regulatory and accounting initiatives or actions, as well as off-balance sheet structures, on the Company's financial statements.

[]     Review and discuss with management and the independent auditors the Company's earnings press releases, and review and approve with management (including the CEO and CFO) the nature of any additional financial information and financial guidance to be provided publicly, to analysts and/or to ratings agencies to ensure that the proposed guidance has a reasonable basis and that all material risks and contingencies are properly disclosed.

[]     Review and discuss with management and the independent auditors the matters required to be discussed by various Statements on Auditing Standards relating to the conduct of the audit, other significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, and any other matters communicated to the Committee by the independent auditors.

[]     Based on its review and discussions with management and the independent auditors, recommend to the Board whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K.

[]     Review with the independent auditors any difficulties encountered in the course of their audit, including any restrictions on the scope of their activities or on access to requested information, any significant disagreements with management and management's response.

[]    Review with the independent auditors any management letter they provide and the Company's responses to that letter.

[]    Review with the internal auditors the Company's control environment, and identify and discuss with the internal auditors their evaluation of the Company's system of processes and controls, including and risk areas that require attention.

[]    Review and discuss with management, including the Disclosure Committee, as provided in further detail below, and the independent auditors the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures. The review and discussion scope shall include any significant deficiencies, material weaknesses and significant changes in internal control over financial reporting management reports to the Committee, any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting, and any special audit steps adopted in light of material control deficiencies.

[]    Oversee the work of the Disclosure Committee. The Audit Committee shall meet separately with, and review reports from, management and the Disclosure Committee (including the Chair of the Disclosure Committee) at least once each quarter, and more frequently if necessary, to effectively supervise the Company's disclosure function and specific disclosure issues of particular importance.

[]    Review with the Disclosure Committee or other management any financial statements, including, but not limited to, any Form 10-Q, Form 10-K, Form 8-K (reporting earnings), or annual proxy statement issued by the Company, to ensure sufficient material risk disclosures.

[]    Review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements or compliance with legal or regulatory requirements, and the performance and independence of the Company's independent auditors.

*With Respect to Other Matters*

[]    Review disclosures made to the Committee by the Company's CEO and CFO during their certification process for periodic reports filed with the SEC about: (i) any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses therein, (ii) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting, or (iii) the effectiveness of the Company's disclosure controls and procedures.

[]      Prepare the report of the Audit Committee the SEC requires be included in the Company's annual proxy statement.

[]      Periodically, meet separately with management, with internal auditors (or other personnel responsible for the internal audit function) and with the independent auditors.

[]      Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's policies with respect to risk assessment and risk management.

[]      Periodically evaluate the Company's risk management process and system in light of the nature of the material risks the Company faces and the adequacy of the Company's policies and procedures designed to address risk, and recommend to the Board any changes the Committee deems appropriate.

[]      Monitor the Company's product and information technology cybersecurity risks and mitigation procedures and advise the Company if changes should be considered.

[]      Develop, with the assistance of the Company's Chief Compliance Officer and other members of senior management, and recommend to the Board a code of conduct applicable to Board members, officers and employees of the Company. The code shall comply with applicable securities laws and regulations and stock market rules, and from time to time or as necessary recommend to the Board any revisions to such code that the Committee deems appropriate or to ensure compliance with such laws, regulations and rules.

[]      Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by the Company's employees of concerns regarding accounting or auditing matters.

[]      Establish guidelines for the hiring of employees and former employees of the independent auditors.

[]      Review and consider Related Party Transactions under, and take other actions contemplated by, the Company's Related Party Transactions Policy.

[]      Review any proposed waiver of the code of conduct as it applies to senior financial and other executive officers and recommend to the Board the disposition of any proposed waiver.

[]      Make regular reports to the Board on the activities of the Committee.

## DUTIES OF THE DIRECTOR DEFENDANTS

58.      As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

59.      The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

60.      By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

61.      Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

62.      To discharge their duties, the officers and directors of the Company were required

to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment

and not the result of outside influences or entrenchment motives.

63.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

64.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.   As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

65.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

66.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

67.     Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants'

wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

68.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

69.    At the time this suit was filed, the Company's Board was comprised of seven (7) members: Defendants Jaworski, Fichthorn, Meyrath, Tracy, White, Clancy, and Blevins (the "Current Directors"). Thus, Plaintiff is required to show that a majority of the Current Directors, *i.e.*, four (4), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

70.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

## THE DIRECTOR DEFENDANTS ARE
## NOT INDEPENDENT OR DISINTERESTED

71.    Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

72.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

73.     Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

74.     As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

75.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

76.     Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein,

and thus, could not fairly and fully prosecute such a suit even if they instituted it.

77.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

78.    Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendant Meyrath**

79.    Defendant Meyrath is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Meyrath cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

80.    As CEO, Defendant Meyrath also fails the stock exchange bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company in its 2025 Proxy Statement.  As such, Defendant Meyrath could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Meyrath is therefore futile.

81.    Defendant Meyrath also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Meyrath is irreconcilably conflicted, faces a substantial likelihood of liability, and

cannot consider a demand to sue.

82.     In addition, Defendant Meyrath receives lucrative compensation in connection with his employment with the Company. Defendant Meyrath is not independent from Defendants Sewell, Ward, and Sridhar as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Meyrath. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Meyrath could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

83.     Because of Defendant Meyrath's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Meyrath is unable to comply with his fiduciary duties and prosecute this action. Defendant Meyrath is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendant Fichthorn**

84.     Defendant Fichthorn is irreconcilably conflicted and could not independently consider a demand to sue because he is the Managing Partner of Dialectic Capital Management, an investment advisor to Dialectic. As the Company notes in its 2025 Preliminary Proxy Statement, in connection with its ongoing efforts to restructure its debt and improve its balance sheet, Quantum entered into a Transaction Agreement with, *inter alia*, Dialectic. Quantum issued to Dialectic a warrant to purchase 2,653,308 shares of its common stock, representing 19.9% of the

outstanding shares of common stock as of the date of the Transaction Agreement.

85.    Accordingly, Defendant Fichthorn, by virtue of his role with Dialectic, could not consider a demand which could, in turn, have an adverse impact on the relationship between the Company and Dialectic and/or Dialectic's interests.

**Defendants Jaworski, Tracy and White**

86.    Defendants Jaworski, Tracy and White served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

87.    Defendants Jaworski, Tracy and White breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Jaworski, Tracy and White face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Excused**

88.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

89.     The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

90.     In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto.  Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

91.     The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

92.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

93.     Publicly traded companies, such as Quantum, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Current Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

94.     Accordingly, each of the Director Defendants, and at least a majority of the Current Directors, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Current Directors is futile and, thus, excused.

## **FIRST CAUSE OF ACTION**

### **(Against the Individual Defendants for Breach of Fiduciary Duties)**

95.     Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

96.     The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

97.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

98.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

99.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

100.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against the Individual Defendants for Gross Mismanagement)

101.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

102.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

103.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

104.   Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against the Individual Defendants for Waste of Corporate Assets)

105.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going.  It resulted in continuous, connected, and ongoing harm to the Company.

107.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

108.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### (Against the Individual Defendants for Unjust Enrichment)

109.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.     By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

111.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

112.     Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B.     Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duty, gross mismanagement, waste of corporate assets, and unjust enrichment;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing

governance obligations and all applicable laws and to protect the Company and its investors

from a recurrence of the damaging events described herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Awarding such other and further relief as is just and equitable.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 28, 2025

**GAINEY McKENNA & EGLESTON**

By: _/s/ Thomas J. McKenna_
    Thomas J. McKenna
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com

_Attorneys for Plaintiff_

**VERIFICATION**

I, BRENT CULLISON, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Quantum Corporation and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Quantum Corporation common stock at all relevant times.

_____
BRENT CULLISON